

FILED
SEP 24 2014
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY    Cp    DEPUTY

LAURA E. DUFFY
United States Attorney
PHILLIP L.B. HALPERN
Assistant United States Attorney
California State Bar No. 133370
EMILY W. ALLEN
Special Assistant U.S. Attorney
California State Bar No. 234961
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone:(619) 546-9738
Fax:      (619) 546-0450
Email:    emily.allen@usdoj.gov

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) Case No.: 14CR2704-BEN |
|---|---|
| Plaintiff, | ) |
| vs. | ) INFORMATION |
| JACK PROBER, | ) |
| Defendant. | ) |

The United States Attorney charges, at all times material:

SECONDARY MORTGAGE MARKET FRAMEWORK

1.  In the United States, residential mortgage lenders typically sell the loans they originate to third-party investors, to the Federal National Mortgage Association (known as "Fannie Mae"), or to the Federal Home Loan Mortgage Corporation (known as "Freddie Mac"). By selling these loans, lenders reduce their credit risk and gain access to additional capital, which in turn provides borrowers with greater access to mortgage loans. This secondary mortgage market exceeds $10 trillion, and is essential to the healthy functioning of the American housing market and the American economy.

2. Secondary mortgage purchasers often combine the loans they purchase into what is known as collateralized mortgage obligations ("CMOs") or residential mortgage-backed securities ("RMBSs"). CMOs and RMBSs are then typically re-sold to institutional investors such as pension funds and insurance companies. These products are then also often combined into ever-more complex collateralized debt obligations ("CDOs"), which may include other types of debt obligations such as corporate loans.

3. This form of mortgage securitization provides increased capital because the risk of default is, in theory, greatly reduced by the aggregation of large numbers of mortgage loans, allowing even high-risk individual loans to be categorized as "safe" investments when they are pooled together.

4. As a result of the secondary market for mortgages, the connection between borrowers and lenders has weakened, as loan originators no longer have a direct stake in ensuring that individual borrowers can repay their loans. As a result, secondary purchasers, who bear the risk of default, heavily influence lending standards. As mortgage loans are re-packaged and securitized, collateralized, and re-sold into products seen as "safe" investments, those lending standards deteriorate. The resulting complexity of mortgage securities products, the lack of regulation and ratings standards, and the abundance of credit availability are often cited as the causes of the financial collapse of 2008.

## BACKGROUND ALLEGATIONS

5. Beginning in approximately 2004, I.H. operated several San Diego businesses, including Blue View (which I.H. operated with a partner and the company's owner), Ocean 18 LLC, Note Tracker Corp.,

2

Nationwide Servicing Center, and Instant Mortgage Lending. At times, I.H. operated these businesses along with his business associate, defendant JACK PROBER ("PROBER"), and with his brother, A.H.

6. Through these businesses, I.H. participated in the secondary mortgage market. I.H. purchased primarily distressed and non-performing mortgages from primary lenders, and serviced the loans by collecting payments from borrowers.

7. In addition to purchasing and servicing loans, I.H. pooled these loans and sold shares of the pools to investors, primarily friends and family, including PROBER. The investors would collect returns when borrowers made monthly payments, paid off their mortgage loans, or after foreclosure on the real property collateral.

8. In approximately 2007, at I.H.'s invitation, PROBER began participating as an investor in the pooled loans purchased by I.H.'s companies. PROBER also recruited additional investors, primarily his own friends and family.

9. I.H. and his companies purchased mortgage notes from, among other lenders, J.P. Morgan Chase ("Chase"), also known as Bank One; and GMAC Mortgage, LLC ("GMAC"), which is now known as Ally Bank. Chase and GMAC were financial institutions insured by the Federal Deposit Insurance Corporation.

10. L.S. worked at Chase in the Residential Loan Department. As part of her job, L.S. sold mortgage loans, including distressed or non-performing second mortgages, to third-party investors, including I.H. Chase sold the notes to the highest qualified bidder after distributing lists of the loans offered for sale.

11. Robert Moreno ("Moreno") (charged elsewhere) worked at GMAC as a Market Manager. As part of his job, Moreno sold mortgage loans,

including distressed or non-performing second mortgages, to third-party investors, including I.H. GMAC sold the notes to the highest qualified bidder after distributing lists of the loans offered for sale.

COUNT ONE

18 U.S.C. § 371

(CONSPIRACY)

12. Paragraphs 1 through 11 are realleged and incorporated by reference herein.

13. Beginning in or around 2009, and continuing through at least in or around June 2013, in the Southern District of California and elsewhere, defendant JACK PROBER knowingly and intentionally conspired and agreed with I.H. and others to commit Bank Bribery, in violation of Title 18, United States Code, Section 215, and Tax Evasion, in violation of Title 26, United States Code, Section 7201.

Purpose of the Conspiracy

14. It was the purpose of the conspiracy that PROBER, I.H., and others would corruptly pay hundreds of thousands of dollars in bribes to L.S. and Moreno (hereinafter together, "the bankers"), which were paid in cash and otherwise concealed from the Internal Revenue Service ("IRS") to assist the bankers in evading federal income taxes on the illicit income, and, in return, the bankers would use their influence at Chase and GMAC to ensure that I.H.'s bids purchase mortgage loans were accepted.

Manner and Means of the Conspiracy

15. To further the conspiracy, PROBER, I.H., and others utilized the following manner and means, among others:

a. The bankers would use their positions at the banks to provide I.H. with inside information about prices and competing bids, in an effort to ensure that I.H.'s bids were accepted.

b. In return, the bankers would corruptly accept hundreds of thousands of dollars in bribe payments from I.H. and his associates, including PROBER, A.H., and Z.H.

c. PROBER, I.H., A.H., and others would arrange to pay the bankers by personal check, and I.H., Z.H., and others would arrange to pay the bankers in hand-delivered cash payments, which the bankers would conceal from the IRS in order to evade paying income taxes.

d. I.H. and Moreno would enter into a sham "consulting agreement," in order to disguise the true nature of the bribe payments and to make them appear like legitimate fees paid for consulting services unrelated to Moreno's work at GMAC.

e. PROBER would recruit investors in part by touting I.H.'s inside connections at the banks and by describing that I.H. would receive information from the bankers that was not available to competitors.

## Overt Acts

16. In furtherance of this unlawful agreement, and to carry out its objects, the following overt acts, among others, were committed within the Southern District of California and elsewhere:

a. In or around 2009, PROBER invested money in pools of mortgages purchased from Chase, knowing that I.H. had paid bribes to L.S. in exchange for L.S.'s assistance in ensuring that I.H.'s bids were accepted.

      b.    In or around 2012, I.H. told PROBER that he had agreed with Moreno to pay "consulting fees," which PROBER understood to be bribes in exchange for Moreno's assistance ensuring that I.H.'s bids to purchase loans from GMAC were accepted.

      c.    In or around 2012, PROBER invested his own and his investors' money in pools of mortgages purchased from GMAC, and knowingly reimbursed I.H. for a portion of the bribes paid to Moreno.

      d.    On or about February 23, 2012, PROBER told his investors that "this month we have a unique opportunity to buy loans before the other investors see the list."

      e.    In or around May 2012, I.H. asked PROBER to write personal checks to Moreno, as bribe payments or "kickbacks" for loans I.H. purchased from GMAC.  I.H. agreed to reimburse Defendant for the payments sent to Moreno.

      f.    On or about May 20, 2012, PROBER wrote a personal check for $7,000 to Moreno, drawn on PROBER's personal bank account.

      g.    On or about May 25, 2012, PROBER wrote a personal check for $5,000 to Moreno, drawn on PROBER's personal bank account.

      h.    On or about May 30, 2012, PROBER wrote a personal check for $7,000 to Moreno, drawn on PROBER's personal bank account.

      i.    On or about June 19, 2012, PROBER told his investors that they had an "opportunity to review other loan offers" before finalizing a sale.

j. On or about June 20, 2012, PROBER told his investors that "we will have prices on all these loans from other investors by Friday/Monday. We will decide loan by loan either [sic] to purchase depending on [] the going rate."

k. On or about July 26, 2012, PROBER wrote a personal check for $7,000 to Moreno, drawn on PROBER's personal bank account.

l. On or about July 27, 2012, PROBER wrote a personal check for $7,000 to Moreno, drawn on PROBER's personal bank account.

m. In or around late 2012, I.H. told PROBER that the amount of money paid to Moreno was growing too large, and I.H. wanted to create a "consulting agreement" with Moreno so that payments made to Moreno would go to a consulting company rather than Moreno directly. The "consulting agreement" was meant to make the bribes appear like legitimate fees paid for consulting services unrelated to Moreno's work at GMAC.

All in violation of Title 18, United States Code, Section 371.

DATED: 9/19/2014

LAURA E. DUFFY
United States Attorney

PHILLIP L.B. HALPERN
Assistant United States Attorney

EMILY W. ALLEN
Special Assistant U.S. Attorney